IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Welfare of: | ) | No. 32437-1-III |
| | ) | |
| B.P. | ) | |
| (DOB: 7/8/11) | ) | |
| | ) | PUBLISHED OPINION |
| | ) | |
| | ) | |

BROWN, J. – H.O. appeals the termination of her parental rights over B.P. H.O. contends substantial evidence does not support the court's findings that (1) all necessary services were expressly and understandably offered or provided her, (2) little likelihood existed to remedy conditions so B.P. could be returned to her in the near future, (3) her continued parent-child relationship diminished B.P.'s prospects for early integration into a stable and permanent home, (4) terminating her parental rights was in B.P.'s best interests, and (5) she was unfit to parent B.P. We disagree and affirm.

FACTS

Soon after B.P.'s birth on July 8, 2011, the Department of Social and Health Services (Department) became involved with her and her family. The Department had previously been involved with the mother and her three other children who are no longer in her care. A hospital hold was placed on B.P. at birth because she was withdrawing

from methamphetamine, which H.O. exposed her to during pregnancy. The mother has been a long time user of illegal substances, including heroin and methamphetamine.

On July 13, 2011, the Department petitioned for dependency, alleging parental deficiencies based on substance abuse, domestic violence, mental health, and parenting skills. The Department then removed B.P. from the mother's care, and after a shelter care hearing, B.P. remained in foster care. The mother agreed to participate in random drug and alcohol testing, hands-on parent training, and mental health treatment.

Later, H.O. entered inpatient treatment at Isabella House, a six-month inpatient program incorporating parenting services. Isabella House permits the placement of children with their mothers at the facility. Initially, the mother entered Isabella House without B.P., but based in part on the mother's progress while there, B.P. was allowed to stay with H.O. on September 27, 2011.

While H.O. was at Isabella House, the Department referred her to Carla Paullin for individual counseling. Ms. Paullin indicated she learned the mother had a traumatic childhood, an extensive criminal record, a lengthy history of substance abuse and relapse, and failed to parent her children for quite some time. Ms. Paullin concluded the mother presented symptoms consistent with personality disorder that exacerbated the mother's impulsivity, inability to cope, and poor decision-making. Further, Ms. Paullin believed the mother was extremely institutionalized, making her ability to improve and stay sober largely contingent upon her presence in highly-structured settings.

2

In February 2012, H.O. completed inpatient treatment at Isabella House. Then, she and B.P. moved to a transition home where women who have completed the inpatient program can live while they are looking for permanent housing if they follow certain rules. Isabella House evicted H.O. from the transition home in June 2012 when H.O. relapsed, causing the court to remove B.P. from H.O.'s care.

Into the fall of 2012, H.O. continued to use methamphetamine. H.O. had not been engaging in services and had been sporadically visiting B.P. H.O. admitted she had been high during those visits.

In May 2013, a pregnant H.O. reentered Isabella House. She gave birth in June 2013 to A.O. That summer, the mother began working with a new individual counselor, Sandra Gorman-Brown. Treatment focused on the mother's capacity to process traumatic events from her past. H.O still had unresolved emotional issues directly related to her past, which has been and continues to be a significant barrier to her recovery as it has caused her maladaptive coping strategies. According to her individual counselor, the mother struggles to "feel her feelings," which has made her unable to have empathy—a significant skill needed to parent children. Clerk's Papers at 168.

H.O. graduated from Isabella House in December of 2013. She began outpatient treatment with Partners with Families and Children, which provides a full range of services for children who have suffered abuse and/or neglect as well as provides mental health and chemical dependency treatment for parenting individuals and their family

3

members. At the time of trial, H.O.'s Partners counselor testified H.O. had missed some support group meetings and thus was noncompliant with her outpatient treatment.

In August 2013, the court ordered supervised visits between H.O. and B.P. Lori Eastep, a family therapist, supervised. Between October 2013 and February 2014, Ms. Eastep had 22 therapeutic visits with H.O. and B.P., with each visit lasting two hours. The main focus was B.P.'s complete disconnect from the mother created by the mother's absence from B.P.'s life. As Ms. Eastep opined, children are just beginning to attach to their caregivers at this critical stage. Due to H.O.'s choices, B.P. had to endure multiple placements that not only inhibited B.P.'s attachment to her mother but complicated B.P.'s capacity to attach generally. Ms. Eastep believed B.P. would never be able to form a real attachment to the mother and that forcing B.P. to do so would significantly injure B.P.'s mental health.

In November 2013, H.O., B.P. and A.O. met with Carol Thomas for a parenting assessment. Regarding healthy attachment, Ms. Thomas indicated the window essentially closes after the first year of life. Having healthy attachment is critical to an individual's mental health. Ms. Thomas observed no evidence of attachment between B.P. and the mother; at best, any connection between mother and child was characterized as a developing social relationship. Ms. Thomas reviewed B.P.'s placement history. Given B.P.'s age and the number of disruptions in placement she had experienced, Ms. Thomas felt B.P. would struggle with forming healthy attachments

4

more than average children, and any further disruptions in placement would increase the likelihood B.P. would never be able to form a healthy attachment.

At the termination trial, Ms. Eastep described H.O.'s relationship with B.P. as a social relationship with an emerging emotional aspect. She further noted an individual's own mental and emotional well-being were fundamental to meet a child's needs. Here, the mother was not able to do that for B.P.

H.O.'s current counselor, Ms. Gormon-Brown also testified to her concerns about B.P returning to H.O.'s care and noted H.O. could not be emotionally available to B.P.

B.P.'s guardian ad litem Karen Schweigert testified B.P. was in H.O.'s care from September 2011 to June 2012 and B.P. did fairly well. She testified the relationship between H.O. and B.P. initially was remarkable and "[w]hen [H.O.'s] sober, she is a really good mother." Report of Proceedings (RP) at 240. Ms. Schweigert admitted she has not seen H.O. and B.P. together since their visits resumed in August 2013. She described B.P. as a happy, healthy, and outgoing girl. Ms. Schweigert testified B.P. "still has some issues as far as adjusting to disruptions in her schedule." RP at 230-31. She acknowledged that although it took B.P. some time to get used to the visits with H.O., B.P. adapted.

Ms. Schweigert testified to her concerns about H.O.'s ability to put B.P.'s needs ahead of her own. She acknowledged her concerns about H.O.'s decision making based primarily from information she received from B.P.'s current foster parents. When asked to identify H.O.'s parenting deficiencies, Ms. Schweigert testified H.O. had not

5

had an opportunity to parent by herself outside of structured settings. Ms. Schweigert testified she does not think B.P. can be reunified with H.O., because B.P. is attached to her then current placement. She stated her significant concern for B.P. is her lost attachment to H.O. Lastly, Ms. Schweigert testified termination of H.O.'s parental rights is in B.P.'s best interests.

The trial court determined the Department satisfied its burden under RCW 13.34.180. The trial court issued an oral ruling and later entered written findings of fact and conclusions of law. The trial court specifically found the Department had established each element of RCW 13.34.180 by clear, cogent, and convincing evidence. It expressly found H.O. was currently unfit to parent and that termination of the mother's parental rights were in B.P.'s best interest. H.O. appealed.

ANALYSIS

A. Necessary Services

The issue is whether the trial court erred by finding that all necessary services were expressly and understandably offered or provided. H.O. contends substantial evidence does not support this finding and specifically argues the Department failed to offer attachment therapy to her.

Parents have a fundamental liberty interest in the care, custody, and companionship of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). As such, the State may interfere with parents' rights "only for the most powerful of reasons." *In re S.J.*, 162 Wn. App. 873, 880, 256 P.3d

6

470 (2011) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)). When the parental actions may cause harm or a risk of harm to the child, the State has a right and responsibility to protect the child. *A.J.R.*, 78 Wn. App. at 229; *In re Custody of Smith*, 137 Wn.2d 1, 18, 969 P.2d 21 (1998). Therefore, "reunification must be balanced against the child's right to basic nurture, physical and mental health, and safety; ultimately, the child's rights and safety should prevail." *In re Welfare of A.G.*, 155 Wn. App. 578, 589, 229 P.3d 935 (2010).

Washington courts use a two-step process to determine whether to terminate parental rights. RCW 13.34.180(1); *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). The first step focuses on the adequacy of the parents and requires the State to prove the six statutory elements of RCW 13.34.180(1) by clear, cogent and convincing evidence. RCW 13.34.190(1)(a); *In re A.B.*, 168 Wn.2d at 911. The six statutory elements required by the first step are as follows:

(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the reasonable future have been expressly and understandably offered or provided;
(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

7

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). H.O. first challenges the court's findings regarding (d).

We review the court's findings of fact under RCW 13.34.180(1) for substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent and convincing evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the matter asserted. *S.J.*, 162 Wn. App. at 881. Clear, cogent and convincing evidence exists when the ultimate fact at issue is "highly probable." *K.S.C.*, 137 Wn.2d at 925. We defer to the trial court's evidence weight and witness credibility determinations. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010). The party claiming error has the burden of showing a finding of fact is not supported by substantial evidence. *Fisher Properties v. Arden-Mayfair*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990).

Under RCW 13.34.180(1), the Department must offer all necessary services, capable of correcting H.O.'s parental deficiencies within the reasonable future.

Here, the Department referred H.O. to Ms. Eastep to provide family therapy. Ms. Eastep is a licensed independent clinical social worker with knowledge about attachment. In August 2013, Ms. Eastep was court ordered to conduct a therapeutic contact between B.P. and her mother and eventually conducted 22 sessions with them. Ms. Eastep testified they went from no relationship, to a social relationship to an emerging emotional connection. She opined it would take "hundreds and sometimes

8

thousands of contacts for children to establish a secure attachment." RP at 77. The mother and B.P. went from no relationship, to a social relationship, to an emerging emotional relationship. This evidences the mother and B.P. were receiving services specifically tailored to address their relationship and improve it.

H.O. relies on *In re the Welfare of C.S.*, 168 Wn.2d 51, 225 P.3d 953 (2010) and *In re Termination of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011) to support her argument that not all necessary services were offered. Both cases are distinguishable. In *C.S.*, the child had special needs which made him difficult to manage. *C.S.*, 168 Wn.2d at 55-56. The foster parent was given training to handle the child, but the mother was not. *Id.* at 56. Thus, the Supreme Court held termination was not appropriate as the parent's ability to manage the child was the only parental deficiency left. *Id.* Here, H.O. has mental health issues impacting her ability to parent B.P. The Department provided H.O. with therapeutic services to address her parenting deficiencies and strengthen her relationship with B.P. Ms. Eastep opined B.P. would never be able to form a real attachment to H.O. and that forcing B.P. to do so would significantly injure B.P.'s mental health. Thus, services were offered to the mother without the desired success.

In *In re S.J.*, the Department was offering hands on parenting, and the provider testified she did not ever provide these type of services. *Id.* at 878. The court found the lack of bonding and attachment was an issue because it was the Department's removal of the child that diminished the bond the mother and child had. *Id.* at 883. The court

9

found the Department delayed services to the mother negatively impacting her bond with her child. *Id.* at 883-84. Here, the Department was providing services and B.P. was initially returned to H.O. The mother, however, relapsed and B.P. was removed. H.O. then disengaged in her services and stopped visiting for over a year. The disruption in the parent-child relationship was not caused by the Department, but rather by H.O.'s choices.

Based on the above, the evidence supports the finding that services, specifically tailored to address the nature of the relationship between H.O. and B.P. were provided and were briefly successful, but attachment, a necessary element of a parent-child relationship, could not be attained within the reasonable future. Attachment was the goal with the services offered by Ms. Eastep. The evidence shows that H.O. was receiving the necessary services but the deficiency could not be corrected in the reasonable future. Substantial evidence supports the court's finding that all necessary services capable of correcting the parental deficiencies had been expressly and understandably offered or provided. H.O.'s challenge on this issue fails. Accordingly, the court did not err in finding that all services were offered to the mother as required under RCW 13.34.180(1)(d).

B. Remediation of Deficiencies

The issue is whether the trial court erred by finding little likelihood existed for the conditions to be remedied so that B.P. could be returned to H.O. in the near future. H.O. contends substantial evidence does not support the trial court's finding. H.O.

argues the trial court's finding was in error because all necessary services were not offered to correct her parental deficiencies and any additional deficiencies were already corrected.

Before a court may terminate a parent's rights, the Department must prove "that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). Further, "A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." *Id.* Lastly, "[t]he presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided." RCW 13.34.180(1)(e). The focus of this factor is whether the identified deficiencies have been corrected. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 27, 188 P.3d 510 (2008).

If the parent is unable to resolve their deficiencies within 12 months after the child has been declared dependent, the statute's rebuttable presumption applies and it shifts the burden of production to the parent. *In re Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009). The Department must still prove it is highly probable the parent would not improve in the near future. *Id.* One factor the court may consider is, "Psychological incapacity or mental deficiency of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for

11

extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documentation that there is no treatment that can render the parent capable of providing proper care for the child in the near future." RCW 13.34.180(1)(e)(ii). "A parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether the Department has satisfied RCW 13.34.180(1)(e)." *T.B.*, 150 Wn. App. at 608. Even if evidence shows the parent may eventually be capable of correcting their deficiencies, termination is still appropriate where they will not be corrected within the foreseeable future. *In re Welfare of A.G.*, 155 Wn. App. 578, 590, 229 P.3d 935 (2010).

As discussed, necessary mental health, parenting, and substance abuse services were offered to H.O. to correct parental deficiencies in the over three years since dependency. H.O. argues alternatively her parental deficiencies were corrected. But the record shows H.O. had a long history of substance abuse. She began using drugs at age 13 and her first attempt at in-treatment was when she entered Isabella House in August 2011. She relapsed in May 2012 and was expelled from the program in June 2012. At trial, H.O. had been in out-patient for 2 months but was noncompliant for not attending outside support groups. H.O.'s chemical dependency counselor, Carla Paullin, testified that six months of sobriety could be deemed partial remission and one year to be full remission. However, from her experience of 15 years of chemical

12

dependency treatment, her work with H.O., and her knowledge of H.O.'s use history, she opined H.O. would need 2 years of sobriety to feel good about her sobriety.

H.O.'s mental health was an unremedied parental deficiency. H.O.'s counselor, Ms. Gormon-Brown, indicated H.O. has an extensive trauma history and struggled to feel her feelings. Ms. Gorman-Brown testified H.O.'s trauma history was a barrier to parenting. If a parent cannot feel their own feelings, then they cannot help a child cope with their feelings. At trial, the mother was making progress with addressing her own feelings, but Ms. Gorman-Brown had concerns about B.P returning to H.O.'s care. She was concerned the mother could not be emotionally available to B.P.

The overwhelming evidence shows all necessary services were offered and while H.O. made progress, she had not made enough progress that her parental deficiencies would likely be remedied in the foreseeable future. Substantial evidence shows H.O. needed several more months of sobriety, individual therapy, and hundreds if not thousands of contacts with B.P. to remedy all of her parental deficiencies. When progress has not been made in 12 months following dependency, a rebuttable presumption exists that there is little likelihood conditions will be remedied so that the child can be returned to the parent in the near future. *T.B.*, 150 Wn. App. at 608. Because H.O. fails to produce evidence to rebut the presumption, substantial evidence supports the court's finding there is little likelihood that H.O.'s deficiencies could be remedied in the near future.

13

## C. B.P.'s Prospects

The issue is whether the trial court erred by finding continuation of the parent and child relationship diminished B.P.'s prospects for early integration into a stable and permanent home in the near future. H.O. contends no evidence, let alone no substantial evidence supports this finding.

Before terminating parental rights, a court must find "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home" before parental rights can be terminated. RCW 13.34.180(1)(f). "The plain language of RCW 13.34.180(1)(f) merely requires the trial court to find that the continued parent-child relationship diminishes the child's prospects of *integration* into a stable and permanent home." *In the Matter of K.D.S.*, 176 Wn.2d 644, 658, 294 P.3d 695 (2013). The focus is "on the parent-child relationship and whether it impedes the child's prospects for integration." *Id.* (quoting *K.S.C.*, 137 Wn.2d at 927).

One way to satisfy RCW 13.34.180(1)(f) is evidence of the parent-child relationship causing harm to the child. *K.S.C.*, 137 Wn.2d at 932. "While a detrimental personal relationship would not be irrelevant, this factor is mainly concerned with the continued effect of the legal relationship between parent and child." *In re P.P.T.*, 155 Wn. App. 257, 268, 229 P.3d 818 (2010).

Substantial evidence in the record shows B.P. needs permanence and is at risk of forming an attachment disorder. Ms. Eastep testified B.P. was a child in need of

14

permanence. Going between H.O. and her foster home was confusing, and after being in the system her entire life, B.P. needed to know what her world was going to look like. H.O. argues the need for permanency was not established because H.O. and B.P. were visiting and trying to build a relationship, but the evidence in our record shows B.P. would not be able to attach to her mother based on the H.O.'s parental deficiencies. Another disruption in placement could cause long term emotional harm to B.P. The testimony shows B.P. needed permanency that should could not receive with H.O. Accordingly, continuation of the parent and child relationship clearly diminished B.P.'s prospects for early integration into a stable and permanent home.

### D. Best Interests

The issue is whether the trial court erred by finding that it was in B.P.'s best interests to terminate her mother's parental rights. H.O. contends the record lacks substantial evidence to support this finding.

In addition to the first step of finding the six elements of RCW 13.34.180(1) by clear, cogent and convincing evidence, the trial court must find by a preponderance of the evidence that termination is in the child's best interest. RCW 13.34.190(2). "Only if the first step is satisfied may the court reach the second." *A.B.*, 168 Wn.2d at 911. We afford a trial court broad discretion in making the "best interests" determination, and its decision receives great deference on review. *In re Welfare of Young*, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979). Whether termination is in a child's best interests is based on the particular facts and circumstances of each case. *In re Dependency of A.V.D.*, 62

15

Wn. App. 562, 572, 815 P.2d 277 (1991). When a parent has failed to rehabilitate over a lengthy dependency period, a court is fully justified in finding termination to be in a child's best interests rather than leaving the child "'in the limbo of foster care for an indefinite period'" while the parent seeks further rehabilitation. *In re Dependency of T.R.*, 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (quoting *In re Dependency of A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

Here, the evidence is overwhelming that termination is in B.P.'s best interest. Ms. Eastep testified B.P. needed permanence and opined B.P. needed no significant change in her life. Ms. Schweigert, B.P.'s guardian ad litem, had concerns about the mother's ability to place B.P.'s needs ahead of her own. She did not feel that the mother would be able to parent B.P. She testified termination was in B.P.'s best interest. Other than H.O., no witness indicated termination was not in B.P.'s best interest. The court's finding was supported by substantial evidence.

## E. Unfitness

The issue is whether the court erred in finding H.O. currently unfit to parent B.P. H.O. contends the evidence shows she was capable of parenting another child; therefore, she is capable of parenting B.P.

The Department is held to the higher burden of proving current unfitness in a termination proceeding by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). To meet its burden to prove current unfitness in a termination proceeding, the Department is required to prove that the parent's parenting deficiencies

16

prevent the parent from providing the child with "basic nurture, health, or safety" by clear, cogent, and convincing evidence. RCW 13.34.020.

Current parental unfitness is implicitly established when the Department proves all six of the statutory elements. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011). A court can explicitly make a finding of current parental unfitness. *A.B.*, 168 Wn.2d at 920-21. Here, the trial court made an explicit finding that the mother was currently unfit to parent B.P. To meet its burden to prove current unfitness in a termination proceeding, the Department must prove the parent's parenting deficiencies prevent the parent from providing the child with "basic nurture, health, or safety" by clear, cogent, and convincing evidence. *In re Welfare of A.B.*, 181 Wn. App. 45, 61, 323 P.3d 1062 (2014).

H.O. initially reunified with B.P., but when B.P. was 11-months-old, H.O. relapsed and the child was removed. The mother did not visit her child on any consistent basis for the next year. By the time the mother resumed contact with B.P. she had developed the beginnings of an attachment disorder. The mother struggled to feel her own feelings and had maladaptive coping strategies. In order for B.P.'s needs to be met, including addressing her attachment issues, her parent would need to be able to cope with their own feelings in order to help B.P. address her feelings in a healthy way. H.O. did not demonstrate an ability to do this. Further, H.O. had just begun her sobriety. She had not demonstrated an ability to remain sober outside of a structured setting. She did

17

not acknowledge the emotional damage B.P. suffered with the removal from her care. She did not demonstrate the ability to place B.P.'s needs ahead of her own.

H.O. points to her ability to parent her youngest child, A.O. to support her argument she is a fit parent. H.O.'s alleged parenting abilities regarding A.O. are unpersuasive in light of this evidence. Moreover, the circumstances between the two children vary markedly; one child being constantly with H.O. in a structured environment, while the other was displaced from H.O. for a significant amount of time, creating attachment differences. A deficiency that experts testified could not be remedied in the near future. Thus, the court's finding that the mother was unfit to parent B.P. was supported by substantial evidence.

## CONCLUSION

Because substantial evidence supports the court's findings regarding RCW 13.34.180(1)(d)-(f), the best interests of the child, and the mother's unfitness, the court did not err in terminating H.O.'s parental rights.

Affirmed.

Brown, J.

I CONCUR:

Siddoway, C.J.

18

No. 32437-1-III

FEARING, J. (Dissenting) — In parental termination cases, the State of Washington inevitably advances the proposition that the best interest of the child is the court's primary concern. The State also routinely repeats a corollary mantra that, when the interest of the parent and the child conflict, the child's interests prevail. Unfortunately, the State's dogma ignores the principle that the paramount goal of child welfare legislation is to reunite the child with his or her legal parents, if reasonably possible. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 577, 257 P.3d 522 (2011). Sometimes reuniting the parent and child is reasonably possible despite reunification harming the child's best interests. The State's creed also ignores the constitutional principle that a child holds a right to the companionship and support of a parent. An adult has a corresponding constitutional right to the care, custody, and control of her child unless proved unfit as a parent. Many of our state's citizens deem these birthrights to be foreordained by God.

The State of Washington must not become an authoritarian nation or a platonic utopia wherein the government may remove a child from a birth parent and deliver the child to other parents to permanently raise because the birth parent is not the choicest of parents and the child is better served by other parents. The State's action in this unique

case involves such a removal.

This case's circumstances are rare. The State impliedly concedes and the trial court found that H.O. is fit to parent her one-year old daughter. Nevertheless, the State argued and the trial court agreed that H.O.'s rights to a two-year-old child should be terminated because of a lack of bonding. H.O. should not lose her parental rights since an absence of bonding is not a statutory ground for termination, termination on this basis violates H.O.'s constitutional rights, and ending parental claims for want of bonding lacks a firm foundation in science and psychology. Therefore, I respectfully dissent from the termination of H.O.'s parental rights.

My dissent also springs from frustration resulting from vacuous standards found in parental termination law, despite the grave consequences of termination proceedings. Parental termination can be likened to the death penalty. The parent is no more.

## FACTS

The following recitation of facts provides a chronological outline of important events in the life of B.P. The recitation then reviews testimony of the termination trial's eleven witnesses.

### Chronology

**July 8, 2011**

H.O. gave birth to B.P. The hospital placed a hold on B.P. at birth due to her withdrawal from methamphetamine which H.O. used while pregnant.

2

**July 13, 2011**

The State of Washington Department of Social and Health Services (DSHS) removed B.P. from H.O.'s care and filed a dependency petition.

**August 10, 2011**

H.O. entered Isabella House's inpatient treatment chemical dependency program.

**August 26, 2011**

The trial court entered an order of dependency for B.P.

**September 27, 2011**

B.P. returned to H.O.'s care, and the two resided at Isabella House.

**February 12, 2012**

H.O. graduated from Isabella House inpatient program. H.O. moved with B.P. to Isabella House's transition home.

**May 2012**

H.O. began methamphetamine use again.

**June 2012**

Isabella House's transition home expelled H.O.

**June 27, 2012**

The trial court entered an order removing B.P. from H.O.

**July 3, 2012**

H.O. voluntarily returned B.P. to DSHS. B.P. first went to foster care with a stranger. B.P. irregularly visited H.O.

**October 31, 2012**

DSHS suspended visitation between B.P. and H.O.

**November 2012**

DSHS placed B.P. in foster care with relatives.

**May 7, 2013**

H.O. used methamphetamine for the last time.

**May 9, 2013**

A pregnant H.O. returned for the second time to Isabella House. H.O. has been sober since.

**June 18, 2013**

H.O. gave birth to B.P.'s sister, A. A. has always lived in the care and custody of H.O., including when H.O. resided at Isabella House.

**August 14, 2013**

Visits between H.O. and B.P. resumed. Social worker Lori Eastep supervised the visits.

**November 8, 2013**

Carol Thomas, a child therapist, performed a parent-child evaluation of H.O. and B.P. at the request of DSHS. Thomas recommended increased contact between H.O. and

4

B.P.

**December 3, 2013**

H.O. graduated again from Isabella House.

**December 4, 2013**

H.O., with A., moved to Hearth House. H.O. and A. continued to visit with B.P. until trial.

**January 1, 2014**

H.O. and A. moved to St. Margaret's home.

**February 10, 2014**

Parental termination trial began.

Witnesses

*Carla Paullin*

Trial witness Carla Paullin holds a master's degree in psychology. She is a licensed mental health and chemical dependency counselor. She has a contract with DSHS, and, at H.O.'s social worker's request, she provided individual mental health counseling to H.O. at Isabella House beginning on October 3, 2011. H.O. regularly attended counseling with Paullin. According to Paullin, H.O. was highly motivated in treatment. Paullin assisted H.O. with emotional problems arising from H.O.'s relationship with her mother. H.O.'s mother encountered mental health problems and drug use that interfered in her care for H.O. According to Paullin, H.O. wishes to parent

5

better than her mother did. Paullin last saw H.O. on July 3, 2012.

*Marcey Monohan*

Witness Marcey Monohan obtained a bachelor's of science degree in psychology and a master's of social work. She works for DSHS' Division of Children and Family Services. On February 16, 2012, DSHS assigned her to monitor B.P.'s case. B.P. then lived with her mother at Isabella House's transition home. Upon A.'s birth, DSHS assigned Monohan as the social worker for A.'s case.

Marcey Monohan worries about H.O. parenting B.P. because of H.O.'s past substance abuse and missing contact for months with B.P. According to Monohan, H.O. needs 18 months of sobriety and needs to understand the harm she caused B.P. before the mother and daughter are reunited. An attachment between H.O. and B.P. will not occur until forced. Monahan conceded that, in August 2013, DSHS opposed the contact which the trial court ordered.

According to Marcey Monohan, H.O.'s parenting of A. is different. A. is acclimated to her mother. A. is cute, happy and, expressive. A. smiles, giggles, and coos. She is on target developmentally.

Marcey Monohan has observed H.O. and A. on a monthly basis. H.O. meets A.'s needs. Monohan has no concerns with H.O. parenting A. as long as H.O. remains sober. Monohan also observed H.O. with B.P. B.P. looks "good" with H.O. Monohan observed H.O. redirecting B.P. when she displayed aggression. DSHS reduced family therapy with

6

therapist Lori Eastep to once a week because of progress in H.O.'s parenting of B.P.

*Paige Beerbohm*

Witness Paige Beerbohm worked as the primary counselor for H.O. at New Horizon Care Center at Isabella House, when H.O. returned to the home on May 9, 2013 and through December 2013. She is a licensed chemical dependency professional. According to Beerbohm, H.O. progressed very well in substance abuse recovery. H.O. was positive and inquisitive about treatment and relapse prevention. H.O. also participated in mental health counseling at Isabella House in 2013. During H.O.'s stay at Isabella House in 2013, H.O. had no positive urinalysis. H.O.'s relapse prevention program includes written assignments, collages, identifying triggers and relapse warning signs, recognizing healthy coping skills, and identifying her support network. Her father and grandmother are in her support network. Beerbohm, the expert on chemical dependency, had no opinion as to how long H.O. must be in a structured setting to retain sobriety.

When H.O. was at Isabella House, Paige Beerbohm recommended to DSHS that H.O. have visits with B.P. DSHS ignored Beerbohm's recommendation.

*Sandra Gorman-Brown*

Sandra Gorman-Brown is a licensed clinical social worker, who performs family and individual therapy with Grass Roots Therapy Group. She holds a master's degree in social work. On July 26, 2013, Marcey Monohan, H.O.'s social worker, referred H.O. to

7

Gorman-Brown for individual therapy. H.O. then had unresolved issues related to trauma as a child. H.O. eagerly sought the therapy. According to Gorman-Brown, H.O. progressed with regard to development of her trauma narrative, although H.O. needed further resolution of the trauma. H.O. needs at least another six months in individual therapy.

Sandra Gorman-Brown did not know if H.O.'s unresolved mental health issues posed a risk to parenting. According to her, many fit parents never resolve issues created by childhood trauma. Sandra Gorman-Brown testified that H.O. holds empathy for others and shows empathy for B.P.

H.O. worked hard and was highly motivated during mental health therapy with Sandra Gorman-Brown. Gorman-Brown concluded that, as a result of the individual therapy, H.O.'s mental health is reasonably stable. She opined that no mental health issue would prevent B.P. from returning to H.O. At the same time, Gorman-Brown expressed concern about reunification, because she questioned if H.O. can be emotionally available to B.P. Gorman-Brown was not asked if H.O. was emotionally available to A. Gorman-Brown is available to help form attachment between H.O. and B.P.

*Lori Eastep*

Lori Eastep operates Grass Roots Therapy Group which contracts with DSHS to provide services for family preservation. These services include parental assessments and individual and family therapy. Eastep holds a bachelor's of sociology and master's

8

of social work degrees. She is a faculty member at Eastern Washington University and is licensed by the Department of Health as a licensed independent clinical social worker.

Lori Eastep oversaw therapeutic visits among A., B.P. and H.O. beginning on August 14, 2013 at Isabella House. B.P. was then two years old. H.O. had not seen B.P. for eleven months. In advance of the first visit, H.O. worried about diapers and snacks. During the first visit, B.P. did not recognize her mother, but Eastep did not expect B.P. to realize H.O. was her mother. B.P. was not traumatized by seeing her mother on August 14. She tolerated the first visit well. At the conclusion of the one hour visit, B.P. ran to the social worker because she was eager to leave. Eastep supervised another visit on August 23.

After the initial visits, Lori Eastep recommended no further visitation between H.O. and B.P. if the termination trial proceeded in September 2013. Visits resumed in October 2013 because of a trial delay. Eastep oversaw twenty-two visits. The sessions lasted two hours. They continued until the trial in February 2014. B.P. did not identify H.O. as her primary attachment figure. H.O. understood the challenges resulting from missing contact for months. Nevertheless, according to Eastep, H.O. loves B.P. and viewed B.P. as her child.

According to Lori Eastep, an infant forms an attachment at age eleven months. If a child attaches to another person, a change in attachment to the parent does not come without forcing the change. Eastep does not know how long it takes to form an

9

attachment, once an attachment is disrupted. The risks of multiple attachment disruptions include difficult relationships with peers, difficulty at school, difficulty in intimate relationships, high risk adolescent behaviors. Some children react better to attachment disruptions. Eastep does not know if B.P. is a "resilient" child.

Near trial, B.P. saw her current foster parents interact with H.O. This observation lessened B.P.'s anxiety and confusion around H.O. Lori Eastep explained attachment disruptions to H.O. H.O. told Eastep that B.P. is her daughter and she has completed the steps needed for reunification.

During the months that Lori Eastep supervised visits, the relationship between B.P. and H.O. had "moments of improvement." Report of Proceedings (RP) at 70. H.O. came to visits prepared with toys, activities, and snacks for H.O. She asked Eastep good questions in order to be prepared for visits. H.O. asked Eastep helpful questions concerning B.P.'s behavior.

During the supervised visits, Lori Eastep assessed B.P.'s relationship with her sister, A. The relationship between A. and B.P also improved. With A. present at the supervised visits, B.P. went to Eastep for assistance because H.O. was busy aiding A. B.P.'s seeking of Eastep for support decreased with time. H.O. did not force hugs or physical contact that B.P. did not wish.

According to Lori Eastep, H.O.'s relationship with A. is different than the relationship with B.P. H.O. is A.'s primary attachment. H.O. has parented A. since A.'s

10

birth. H.O. was with A. through all of her developmental milestones. H.O. knows A.'s cues and needs. A. is a very healthy, happy, little girl.

Lori Eastep observed that H.O. worked hard to maintain sobriety. H.O. suffered a difficult childhood and is not always attuned to her own needs. Eastep also observed that, with counseling, H.O. improved at expressing her needs. At trial, Eastep could not identify any deficiency that H.O. encountered in parenting. Eastep holds no safety concerns with H.O. caring for B.P. Eastep agreed that returning B.P. to H.O. could be a "very positive thing" for B.P. RP at 98.

Lori Eastep was reluctant to state that her supervised visits resulted in an "attachment" between B.P. and H.O. Nevertheless, the mother and daughter manifested an emerging emotional connection. If a child already has a secure attachment with one person, the child will not attach to another. For B.P. to attach to H.O., B.P. would need to sever her relationship with her current caregiver.

The State's counsel asked Lori Eastep at trial:

> Q. In your opinion with your work with [H.O.] and [B.P.], do you see [B.P.] being able to return to her mother's care in the near future?
> A. Well, I don't think that that's a yes/no question. I think that [B.P.] needs permanence, and I think that what the Court's going to decide is that's either with the relatives or that's with [H.O.]. And I think either way there's going to be consequences to that decision.

RP at 84. Eastep also testified:

> Q. So at this time do you have an opinion about whether termination is in [B.P.'s] best interest?
> A. I think permanency is in [B.P.] best interest. This may not be the

11

best answer, but I had suggested a guardianship. That's what I thought was in [B.P.'s] best interest was for [H.O.] to retain her parental rights and be involved with her child, but that [B.P.] remain with her current placement because she is attached to them and is doing very well there.

RP at 85.

### Carol Thomas

Carol Thomas is a child therapist and evaluator. She holds a bachelor's degree in sociology and a master's degree in childhood family studies and child development. She provides therapy to children who experienced trauma. She performs parenting assessments. Thomas is a licensed mental health counselor.

At the request of DSHS, Carol Thomas performed a parent-child assessment of H.O. and B.P. on November 8, 2013. B.P. was then two years and four months old. At the beginning of the assessment, Thomas saw B.P. and H.O. in the waiting room. B.P. sat on the social worker's lap and clung to her rather than H.O. When the mother and daughter went upstairs, H.O. asked B.P. to come to her. B.P. complied and sat on H.O.'s lap and quickly warmed to H.O. During the three hour evaluation, B.P. made eye contact with her mom. B.P. approached and engaged her mom. She initiated physical contact and play with her mom. B.P. told her mother she wanted her to hold and carry her. She jumped on her mom to play. H.O. expressed affection to B.P., and B.P. accepted the affection. B.P. smiled and laughed throughout the assessment with her mom.

During the three hour assessment, B.P. went to H.O. or Carol Thomas when hurt or uncomfortable. B.P. received her mother's comfort and care, but did not use H.O. as

12

her sole source of security. B.P. responded to her mother as a parental authority and complied with H.O.'s directions.

A. attended the parental assessment with Carol Thomas. At first, B.P. kicked A. and grabbed A.'s toys. H.O. told B.P. that she should not hit or grab A.'s toys. H.O. redirected B.P, and B.P. complied and cooperated. Later, B.P. became interested in A. During the evaluation, B.P. declared to Thomas: "[T]hat's [A.]." RP at 116. B.P. watched A. and brought her toys. She competed with A. for her mother's attention.

According to Carol Thomas, H.O. managed both children well. During the evaluation, H.O. met both children's physical and emotional needs in a prompt, consistent, and appropriate manner. H.O. encouraged a relationship between the sisters.

Carol Thomas observed no "attachment" between B.P. and her mother, H.O. Thomas described the relationship as a "developing . . . social relationship." RP at 113. Thomas agreed the mother and daughter may sustain an emerging emotional relationship. Thomas knows that B.P. had four placements and three disruptions. B.P. started to attach to a person and then lost the person. According to Thomas, the more disruptions the more likely the child will not be able to attach. Twelve months is needed to form and consolidate an attachment. Thomas agreed she could assist H.O. and B.P. "reintegrate." As a result of her assessment, Carol Thomas recommended that DSHS increase contact between B.P. and H.O. with continuing services.

13

*Amanda Clemons*

Amanda Clemons is a licensed mental health therapist with a master's degree in social work. She specializes in family therapy and attachment services. H.O.'s social worker asked Clemons, in October 2013, to observe B.P. with her aunt and uncle, the current foster parents. Clemons observed that B.P. has a secure attachment with the foster parents. According to Clemons, B.P. needs stability. She worries about B.P. developing an "attachment disorder." According to Clemons, B.P. should not experience another disruption in care. Clemons met H.O. once, but B.P. was not present during the meeting.

*Kolleen Seward*

Kolleen Seward holds a Bachelor of Science in psychology and minor in alcohol and drug studies. She works for Partners with Families and Children as the supervisor for a chemical dependency program. Partners provides intensive outpatient chemical dependency programs.

H.O. began an intensive outpatient program with Partners for Families and Children in December 2013. A participant in the program meets three days a week in a group, engages in one to two individual sessions a month, and attends two outside support groups each week. Kolleen Seward testified that H.O. failed to verify participation in outside groups, although she has attended all meetings at Partners. H.O. has done well with individual and group visits at Partners.

14

Kolleen Seward has "no concerns" about H.O.'s recovery. RP at 174. Nevertheless, Seward recognizes H.O. as a risk for relapse if she does not build support groups.

### Karen Schweigert

Karen Schweigert is a licensed attorney. In July 2011, the trial court appointed Schweigert as B.P.'s guardian ad litem. The court also later appointed Schweigert as the guardian ad litem for sister A.

Karen Schweigert observed the interaction between B.P. and H.O. when the two lived together in late 2011 and early 2012 at Isabella House, before H.O.'s relapse. The relationship was then "remarkable." H.O. focused attention on B.P. H.O. nursed B.P., "which took an unbelievable amount of dedication and patience." RP at 223. B.P. treated H.O. as the center of her universe. B.P. giggled.

Karen Schweigert believes termination of H.O.'s parental rights is in the best interest of B.P. Schweigert has not seen H.O. and B.P. together since visitation resumed in August 2013.

### Amber Eggert

Amber Eggert is the case manager for H.O. at St. Margaret's, the structured living facility where H.O. and A. lived at the time of trial. The two moved to St. Margaret's on January 1, 2014. Eggert monitored H.O.'s compliance in the program and contacted other service providers. Pursuant to house rules, H.O. obeyed an 8:30 curfew, performed

15

house chores, and supervised A. at all times. H.O. successfully underwent random urinalyses. H.O. has complied with St. Margaret's program and rules.

### H.O.

According to H.O., she received different and better treatment at Isabella House the second time. She now knows the hurt and confusion she caused B.P. and believes she is the best one to solve it. She recognizes the difficultly of caring for B.P., but insists that she is capable. According to H.O., the best place for B.P. is with her mom and sister.

At the time of trial, H.O. underwent outpatient treatment at Partners with Families and Children three times a week for two hours each time. She also underwent individual therapy with Sandra Gormon-Brown. She submitted to urinalyses four or five days a month. She attended life skills classes and a family unification program. She participated in self-help meetings at St. Margaret's.

H.O. insisted, at trial, that she complied with the requirement to attend meetings with outside groups. St. Margaret's initially believed otherwise. According to H.O., she went twice per week to a Celebrate Recovery church service but only turned in one slip. This misstep explained St. Margaret's questioning of compliance. H.O. testified that she has many support persons, including her father, aunt, a cousin, and church members.

H.O. testified at trial that she breast feed A. B.P. would then get jealous of her paying attention to A. H.O. testified that B.P. loves her sister, A. She wants to help with A. She is protective of A.'s things.

16

H.O. testified that, if she had been given more visitation with B.P., the two would have bonded further. B.P. now runs to H.O. when she is hurt. B.P. wants H.O. to arrange her hair. She sits on H.O.'s lap, and the two read together. According to H.O., B.P. and she enjoy an emotional relationship. B.P. now hugs and kisses H.O. B.P. expects protection and companionship from H.O. now that B.P. trusts H.O. B.P. calls H.O. "mama [H]" and her foster mother "mama [S]." RP at 375.

Understandably, H.O. desires B.P. to be with her sister, A. H.O. is grateful for B.P.'s relatives who served as foster parents and wishes B.P. to continue a relationship with them.

### Trial Court Findings

When terminating the parental rights of H.O. to B.P., the trial court entered the following findings of fact, among others:

> 10. All court ordered services have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting parental deficiencies within the foreseeable future have been offered or provided including: chemical dependency inpatient treatment, outpatient treatment, UA/BA monitoring, individual counseling, parenting assessment, parenting services including family preservation services and therapeutic visits with Ms. Eastep in part to address the mother child relationship. The services offered were those needed to remedy [H.O.'s] parental deficiencies. The Department established RCW 13.34.180(1)(d) by clear cogent and convincing evidence.

CP at 166.

> 13. . . . Substance abuse will be an issue that the mother has to address for the rest of her life.

17

CP at 167.

22. [H.O.] also had issues with her parental relationship with [B.P.]. [B.P.] was in foster care for the first two months of her life. She then was placed with her mother until she was 11 months old. Around 11 months is the age when a primary attachment is forming and solidifying. It was at this crucial developmental stage when [H.O.] relapsed and [B.P.] was removed from her mother's care. [H.O.] then continued to use and was inconsistent in her visitation with [B.P.]. On October 31, 2012, the dependency court, on its own motion, suspended the mother's contact pending further court order due to her lack of consistency in visiting and the harm it was doing to the child. During this time, [B.P.] was in her third placement in foster care. In November 2012, [B.P.] was moved into her fourth placement, with paternal relatives.

CP at 169.

28. In November 2013, [H.O.] met with Carol Thomas and both of her children for the purpose of a parenting assessment. Ms. Thomas indicated that with attachment, the window to form a healthy attachment closes after the first year. Having a healthy attachment is critically important to an individual's mental health. At the time of the assessment, Ms. Thomas observed no evidence of attachment or attachment formation between [B.P.] and [H.O.]. At the time there was only a developing social relationship, which Ms. Thomas expected given there had only been 7 recent visits between the mother and [B.P.], some of which were also attended by the infant A.

. . . .

30. There is little likelihood that conditions will be remedied so that the child can be returned to the parent(s) in the near future. [H.O.] will have to deal with substance abuse issues for her entire life. She also still needed to address her mental health issues. The mother had been involved in services for nearly 3 years, and her relationship with [B.P.] was such that there was little likelihood [B.P.] could be returned to her mother in the near future.

CP at 170.

33. The court was concerned about what attachment services were offered to [H.O.]. However, the evidence was overwhelming that [B.P.]

18

was a child who was in her fourth placement. Her ability to attach was already compromised. The evidence was clear that to form an attachment you first had to have contact, then building a social relationship, then an emotional relationship, then an attachment. [B.P.] was only at a social relationship with [H.O.] at the time of trial, the emotional relationship was just emerging. The court finds that the services necessary to build the type of relationship necessary to meet [B.P.'s] needs would take one year or more and that is too long.

CP at 171.

35. . . . [B.P.] is a child in need of stability. At the time of trial, [B.P.] was at risk of an attachment disorder. These types of disorders cause learning issues, and social and emotional issues for children.

36. [B.P.'s] foreseeable future is now. [H.O.] is still at the beginning of her progress. Her sobriety is recent and she has not had any success living independently. Her parenting of her infant, A., looks positive, but that is likely because A. has never been out of [H.O.'s] care. The disruption in placement caused by [H.O.] by her relapse in 2012 cannot be ignored. The relationship between [H.O.] and [B.P.] is not comparable to her relationship with A. There is little likelihood that [B.P.] could be returned to her mother in the foreseeable future. The Department has established RCW 13.34.180(1)(e) by clear cogent and convincing evidence.

37. Continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a permanent and stable home. Continuation of [H.O.'s] relationship with [B.P.] impedes her ability to be placed in a stable and permanent home. Without termination, the child remains in the limbo of foster care indefinitely.

38. [B.P.] is entitled to a family and permanency now. Continuing to visit with [H.O.] will prolong her anxiety and diminish their prospects for early integration into a stable and permanent home. [B.P.] is at risk of developing an attachment disorder. In order to maintain [B.P.'s] mental health, she needs permanency now. The Department has established RCW 13.34.180(1)(f) by clear cogent and convincing evidence.

39. [H.O.] clearly loves [B.P.] and wants to parent her. However, [B.P.] can no longer wait for [H.O.] to remedy her parental deficiencies.

40. It is in [B.P.'s] best interests to terminate the parent-child relationship. The Department established RCW 13.34.190 by a preponderance of the evidence.

41. The mother is currently unfit to parent [B.P.]. This element

19

requires the court to determine if [H.O.] is able to meet [B.P.'s] needs. The evidence clearly indicates that she cannot. . . . She does not understand [B.P.'s] needs for permanency or the risk she faces if she develops an attachment disorder. [H.O.] cannot claim that because A. is in her care, that she must be fit to parent. [B.P.'s] needs are different and her attachment issues are the result of her mother's actions. . . . Thus, the Department has established that [H.O.] is currently unfit to parent.

CP at 172-73.

## LAW AND ANALYSIS

I would reverse the termination of H.O.'s parental rights to B.P. on at least three, if not four, grounds. First, the State failed to prove that it provided all reasonable and necessary services to correct H.O.'s parental deficiencies. Second, the State failed to show that B.P. and H.O. cannot reunite within the near future. Third, the State likely failed to establish that termination of parental rights was in B.P.'s best interests. Fourth, the State fell short in proving B.P. is an unfit mother and thereby denied her constitutional rights by terminating her parental rights. I will address these grounds in such order.

### *Necessary Services*

Termination of parental rights is a two-step process. *In re Welfare of C.B.*, 134 Wn. App. 942, 952, 143 P.3d 846 (2006). First, the State must show that six statutory requirements under RCW 13.34.180(1) are established by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). This means the State must show that the relevant ultimate facts in issue are "highly probable." *In re Dependency of K.R.*, 128 Wn.2d 129,

20

141, 904 P.2d 1132 (1995) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). Second, the State must show a termination order serves the best interests of the child. RCW 13.34.190(1)(b). The trial court must find by a preponderance of the evidence that termination is in the best interests of the child. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

One of the six statutory requirements is the State's provision of services needed to correct deficient parenting skills. When the State seeks to terminate a parent's rights, it must show, in part, by clear, cogent, and convincing evidence:

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided *and* all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

RCW 13.34.180(1) (emphasis added). To meet this statutory burden, the State must tailor the services it offers to meet each individual parent's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). The State must provide all court-ordered and necessary services to the parent. *In re Dependency of D.A.*, 124 Wn. App. 644, 651, 102 P.3d 847 (2004).

This dissent will repeatedly emphasize the undisputed facts and implied, if not express, finding of the trial court that H.O. is a fit parent for A. This apparent inconsistency begs the question: what is the difference between H.O.'s parenting of B.P. and H.O.'s parenting of A.? The trial court answered the question with its finding that A.

21

has a parental attachment to H.O. missing in the relationship between H.O. and B.P. B.P. was not in her mother's care at ten or eleven months of age and thus a strong bond never attached. The State argues B.P. is attached to her foster parents and needs to retain this attachment, although remarkably the foster parents did not care for B.P. until age sixteen months, an age after which the State claims is critical for attachment.

The trial court's answer to our question should not end the inquiry. No law demands that a parent lose rights to a child because of a lack of bonding, let alone a lack of intense bonding. Science may recognize the importance of bonding with a parent below the age of one, but science does not support a finding that bonding cannot occur at a later age. The state and federal constitutions do not permit the rending of a child from a parent because of a lack of bonding when the parent is not proved unfit.

Counselor Sandra Gorman-Brown testified that she is available to help form attachments between H.O. and B.P. State expert Carol Thomas also testified that she could provide services to help H.O. and B.P. form a bond and parent-child attachment. Thomas agreed she could assist H.O. and B.P. reintegrate. As a result of her assessment, Thomas recommended to DSHS increased contact between B.P. and H.O. with continuing services. Instead, the State sought termination of parental rights.

DSHS provided H.O. numerous services. Nevertheless, contrary to the assertion of the majority, the record is absent of any mention of DSHS providing attachment therapy for H.O. and B.P. The record is also absent of any facts or finding that

attachment therapy would be worthless. The majority concludes that the mother and B.P. received services specifically tailored to their relationship. The majority does not identify the tailored services. The undisputed facts are that bonding therapy could have been given but was not. The majority writes that DSHS provided attachment services designed to help B.P. attach to any parent figure. The record is otherwise. Assuming such services were provided, they were not tailored to B.P. and H.O.

A controlling decision is *In re Welfare of S.J.*, 162 Wn. App. 873, 256 P.3d 470 (2011). Because of its parallel facts, including witnesses and institutions, I discuss *S.J.* at length. If anything, DSHS established less cause to terminate H.O.'s parental rights than it established with regard to the mother in *S.J.* S.J.'s mother lacked the same bonding with the child that DSHS and the trial court consider crucial in H.O.'s relationship with B.P. Thus, *S.J.* dictates a reversal in this appeal. Rarely is a reported decision so similar, but yet we draw the opposite conclusion in this appeal. In fairness to the majority, Washington reports are replete with decisions regarding termination rights, and one can find support for any argument in one of the many cases. Nevertheless, *S.J.* is this division's own recent opinion.

In *In re Welfare S.J.*, T.H. appealed the termination of her parental rights to her son, S.J. T.H. argued that the trial court erred in finding all necessary services had been offered or provided because DSHS failed to provide timely mental health services or sufficient attachment and bonding services. We agreed. T.H. gave birth to S.J. in

23

November 2002. In April 2005, DSHS removed S.J. and his older half-brother from T.H.'s care due to allegations of unsanitary living conditions and drug use. Upon entry of a dependency, the trial court required T.H. to complete a substance abuse evaluation and treatment, submit to random urinalysis testing, complete a psychological evaluation, participate in mental health services, join a domestic violence victims' program, participate in a parenting assessment, and establish a safe, clean, drug-free home. Between June 2005 and December 2005, T.H. unsuccessfully treated at three inpatient treatment centers. T.H. discovered she was pregnant in January 2006. T.H. successfully completed an inpatient treatment program in February 2006. She planned for an outpatient program and arranged for posttreatment living at the Safe Harbor House and Maternity Home. In March 2006, T.H. participated in a psychological evaluation with Christine Guzzardo. Guzzardo diagnosed T.H. with bipolar disorder and borderline intellectual functioning. T.H. began individual counseling, actively participating in her sessions and improving her ability to identify symptoms of a bipolar episode and get the help she needed. In April 2006, T.H. began supervised visitation with S.J. at the YWCA. In May 2006, she transferred to the YWCA's parenting education program. Despite making progress in her initially identified parental deficiencies, DSHS decided T.H. had not secured suitable housing or progressed in her relationship with S.J. In May 2006, DSHS petitioned to terminate T.H.'s parental rights.

During the pendency of the termination petition in *S.J.*, T.H. successfully

24

graduated from the drug treatment outpatient program. At trial, she explained she could have completed treatment sooner had her mental health issues been addressed at the same time. T.H. moved into the Safe Harbor House and Maternity Home as planned. T.H. had her other baby in August 2006. The baby remained in T.H.'s care. In November 2006, T.H. moved into St. Margaret's women's shelter in order to find housing allowing S.J. to live with her. While at St. Margaret's, T.H. cared for her newborn.

In December 2006, T.H. and S.J. began therapeutic visitation with Carol Thomas. Thomas' role was to help create a healthy parent-child relationship. T.H. faithfully kept the scheduled visitations and applied parenting suggestions. The therapeutic visitation continued until March 2007, just before trial, when the visits were suspended at Thomas' urging due to the harmful impact of the visits on S.J. S.J.'s behavior toward T.H. grew resistant. Thomas theorized S.J. had detached from T.H. and had attached to his foster parents. S.J. clung to the foster parents when he arrived at visitation and S.J. encountered stress after visits. At the termination trial, a family preservation therapist testified that she could provide attachment therapy and that T.H. had requested the therapy.

At trial in *S.J.*, DSHS' social worker testified that T.H. and S.J. lacked bonding. Nevertheless, he had not referred T.H. for bonding and attachment services, in part, because T.H. did not request the services and he wanted to save her time traveling on the bus. The social worker testified he supported the termination despite his recommendation that the newborn remain with T.H., because T.H. had failed to rectify

25

her relationship with S.J. and because S.J. had been out of her care for one and a half years. The social worker opined that S.J. could not wait any longer for T.H. to remedy her parental deficiencies and that he needed stability.

At trial in *S.J.*, the YWCA parent educator testified that S.J.'s behavior escalated during the visits. The parent educator opined that T.H. made no progress in her parenting of S.J. because she was unable to recognize S.J.'s emotional needs. Carol Thomas noted that T.H.'s attempts to provide behavior controls and to guide and direct S.J. were minimal and ineffective. She opined T.H. was unable to supply S.J. with emotional support, calm S.J., or initiate physical contact with S.J. without S.J. becoming angry. Thomas opined it was unlikely that a healthy relationship would develop in the near future due to S.J.'s entrenched perception of his mother and T.H.'s inability or unwillingness to parent S.J. effectively. The guardian ad litem testified S.J. encountered behavior problems including hitting, kicking, harming animals, destroying property, and other violent behavior. She stated that S.J. could not wait any longer for T.H. to remedy her parental deficiencies despite T.H.'s success and improvement. In its findings of fact, the trial court found that, despite numerous services, T.H. failed to repair her relationship with S.J. The trial court noted Carol Thomas' testimony that T.H. was unlikely to perceive and cope with S.J.'s behavior problems in the near future.

On appeal in *S.J.*, we reversed the termination of S.J.'s parental rights. We held that the trial court erred in finding all necessary services had been provided, despite

26

recognizing that our review was limited to determining if substantial evidence supported the trial court's findings of fact. We noted that the State failed to earlier integrate mental health services with chemical dependency services. Thus, DSHS failed to tailor T.H.'s services to her concurrent problems. More importantly, we noted that DSHS failed to provide necessary bonding and attachment services, even though the State contended that a lack of attachment and bonding prevented T.H. from caring for S.J. We rejected the State's speculative argument that T.H. could not benefit from attachment and bonding services. The record showed T.H. applied the suggested parenting skills and attempted to control S.J.'s behavior but was met with unusually strong controlling and aggressive behavior from S.J. DSHS needed to work with S.J. to reduce this unusual behavior. T.H. did not possess the responsibility to counteract S.J.'s new controlling and aggressive behavior related to his detachment from T.H. during his bonding with the foster parents while in State care. To the contrary, DSHS held the responsibility to identify needed bonding services and to provide them, particularly when DSHS relied on the lack of bonding in advocating termination. The child's bonding with foster parents was not an excuse for termination. The record showed T.H. maintained a relationship with her other child who did not exhibit S.J.'s unusual controlling and aggressive behaviors. Considering S.J.'s detachment from T.H. while in State care, placing the burden on T.H. to repair the detachment damage was fundamentally unfair. The trial court erred in finding that all necessary services had been provided.

27

In this appeal, the State blames H.O. for the termination of her parental rights because H.O. relapsed in substance abuse when B.P. was ten months old, a critical age for a parent and child to bond. The State seeks to distinguish our ruling in *S.J.* on this ground. Although T.H. also lost contact with S.J. at this critical age, the loss resulted from a relapse related to the State's failure to provide mental health counseling with the chemical dependency assistance. Nevertheless, in this appeal, testimony shows that mental health counseling improved the second time H.O. underwent chemical dependency treatment at Isabella House. Still other reasons demand we follow *S.J.* in this appeal.

If one logically extended the State's argument, the State should have terminated the parental rights at the time of H.O.'s relapse in May 2012 or at least withheld additional services from H.O. Upon the relapse, H.O. needed months to recover from substance abuse, and the services would not be complete before B.P. turned one year of age. Under the State's theory, B.P. and H.O. could never have bonded because B.P. would not be within the care of H.O. as she approached one year of age. Under the State's theory, services were useless upon H.O.'s relapse. Nevertheless, DSHS never told H.O. to stop attempting to improve herself so she could regain care of B.P. Instead the State teased H.O. and continued to provide services, albeit insufficient services, for another year and one-half. H.O. engaged in the services so that B.P. would be returned. All of the provided services met success. Under such circumstances, both the law and

28

equity demand a return of B.P. to her mother.

According to the State, the first year is critical to bonding between the child and the parent. This lack of bonding is irreparable, at least when the child lives with foster parents. Therefore, under the State's theory, a parent absent from her child's first year of life is subject to automatic termination of parental rights. If the State's position were accurate, the law would need changing. The law does not state that one who has little contact with a child before the child reaches one year of age must have rights terminated. The Washington statutory scheme makes no mention of even a presumption that the parent and child cannot form an attachment after the child turns one year of age.

A presumption that a parent and child cannot later bond also conflicts with principles of attachment theory as developed and explained by mental health practitioners. Commentators surveying relevant case law discovered that courts employ the terms "bonding" and "attachment" "in an all-or-nothing manner—either the child is bonded or attached or the child is not. They do not acknowledge the spectrum of intensity in relationships. From a neurodevelopmental point of view, the courts' use of these terms is imprecise." David E. Arredondo & Leonard P. Edwards, *Attachment, Bonding, and Reciprocal Connectedness: Limitations of Attachment Theory in the Juvenile and Family Court*, 2 J. CENTER FOR FAMILIES, CHILD. & CTS. 109, 116 (2000). Commentators urge judges and attorneys to exercise caution when employing any concept "referring to human relatedness." Arredondo, *supra*, at 123.

29

Attachment is not a quantifiable trait, but rather a theory first developed in the 1940s. Attachment theory postulates "that young children attach to their parents, usually their mothers, and that their later functioning can be explained by the quality of this attachment." Pamela S. Ludolph & Milfred D. Dale, *Attachment in Child Custody: An Additive Factor, Not a Determinative One*, 46 FAM. L.Q. 1, 2 (2012). For research purposes, theoreticians classify attachments into one of five categories: secure, insecure-avoidant, insecure-resistant, ambivalent, or disorganized. Arrendondo, *supra*, at 110-11. Nevertheless, these "rigidly defined categories . . . are insufficiently subtle to describe in a forensic setting the rich and complex spectrum of dimensions of human interrelatedness." Arredondo, *supra*, at 111.

The limits to which a court should rely on attachment between the parent and child in a parental termination proceeding comes into focus when considering that only about 60 percent of surveyed American children demonstrate predominately secure attachment. Arredondo, *supra*, at 110. Despite this lack of strong attachment, "[it] would not seem sensible to regard 40 [percent] of infants as showing biologically abnormal development." Arredondo, *supra*, at 110 (internal quotation marks omitted). Stated another way, while secure attachment is the ideal, it is by no means static and is one of several forms of attachment that children will develop over time. One court observed:

> It is usual for an infant to form more than one attachment even in the first years of life . . . [T]he evidence does not necessarily suggest that it is essential or even optimal for mother and child to form an exclusive dyad. Indeed, a spreading of attachment relationships over several figures may be

healthy and may, under some circumstances, prove to be highly adaptive. In one sense, "multiple" mothering is an insurance against separation disturbance.

*In re Interest of R.B.W.*, 192 Ill. App. 3d 477, 548 N.E.2d 1085, 1096-97, 139 Ill. Dec. 529 (1989) (citation omitted).

As the commentators and the testimony of Lori Eastep and other providers demonstrate, the State's position that H.O. missed her window of opportunity to form a secure attachment with B.P. is theoretically incorrect in addition to being legally insufficient to justify termination. The State could and should have offered attachment therapy to H.O. and B.P. as their providers recommended.

If I wrote the majority opinion, I would end here because the analysis regarding failure to provide necessary services would be sufficient to reverse the trial court's order of termination. I continue with this dissent, however, to identify and ruminate on other grounds on which the order should be vacated. A dissent needs to employ all arrows in its minority quiver.

*Remedy of Parental Deficiencies in Near Future*

Another of the six statutory requirements for termination of parental rights is the parent's failure to promptly remedy parental deficiencies. Under RCW 13.34.180(1)(e), DSHS must show:

> That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable

31

presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. In determining whether the conditions will be remedied the court may consider, but is not limited to, the following factors:

(i) Use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documented multiple failed treatment attempts;

(ii) Psychological incapacity or mental deficiency of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documentation that there is no treatment that can render the parent capable of providing proper care for the child in the near future; or

(iii) Failure of the parent to have contact with the child for an extended period of time after the filing of the dependency petition if the parent was provided an opportunity to have a relationship with the child by the department or the court and received documented notice of the potential consequences of this failure, except that the actual inability of a parent to have visitation with the child including, but not limited to, mitigating circumstances such as a parent's current or prior incarceration or service in the military does not in and of itself constitute failure to have contact with the child.

The "near future" is a key term in RCW 13.34.180(1)(e). The parental deficiencies must be remedied such that the child may be returned to the parent in the "near future." "Near future" is determined from the child's point of view. *In re Dependency of A.C.*, 123 Wn. App. 244, 249, 98 P.3d 89 (2004). What constitutes "near future" depends on the age of the child and the circumstances of the child's placement. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 205, 108 P.3d 156 (2005). The cases

32

support the proposition that the younger the child, the shorter is the "near future." A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency. *In re Welfare of M.R.H.*, 145 Wn. App. at 28 (2008).

The focus of subsection (e) is "whether the identified deficiencies have been corrected." *M.R.H.*, 145 Wn. App. at 27. Even when evidence shows that the parent may eventually be capable of correcting parental deficiencies, termination remains appropriate when deficiencies will not be corrected within the foreseeable future. *In re A.W.*, 53 Wn. App. 22, 32, 765 P.2d 307 (1988). If the State offers or provides all necessary services reasonably capable of correcting parental deficiencies within the foreseeable future, and the parent does not substantially improve within a year of the dependency order, a presumption arises that the State has established RCW 13.34.180(1)(e). *In re Welfare of A.G.*, 155 Wn. App. 578, 590, 229 P.3d 935 (2010). Even if RCW 13.34.180(1)(e)'s rebuttable presumption applies, the State must convince the trial court of a high probability that the parent will not improve in the near future. *In re Welfare of C.B.*, 134 Wn. App. at 956 (2006). Because a parent's constitutional rights are implicated, the presumption shifts only the burden of production to the parent. *C.B.*, 134 Wn. App. at 955.

Parents before the court in dependency proceedings rarely come without significant difficulties. *In re Dependency of T.L.G.*, 126 Wn. App. at 203. Nonetheless,

33

the paramount goal of child welfare legislation is to reunite the child with his or her legal parents, if reasonably possible. *In re Dependency of K.N.J.*, 171 Wn.2d at 577.

A relevant decision is *In re Welfare of C.B.*, 134 Wn. App. 942, 956, 143 P.3d 846 (2006). In *C.B.*, this court reversed a parental termination order because the mother showed significant remediation by the time of trial. DSHS contended that the past behavior of the mother established the rebuttable presumption. The mother contended that she rebutted that presumption because she made substantial progress. The mother's home had earlier been found unfit for children. Nevertheless, DSHS presented no testimony at the termination hearing that the mother's home was unsafe. Although she was dilatory, the mother completed parenting classes. She was more dilatory in attending anger management classes, but was in attendance at the time of the termination trial.

In *Welfare of C.B.*, the mother's primary deficiency related to drug use. This court held that the mother met her burden to produce evidence of improvement because she completed her chemical dependency programs and presented evidence from her counselors and friends of a good prognosis. The mother's only outstanding deficiency was anger management, for which she was enrolled to begin a class shortly after the termination hearing. DSHS presented no evidence that reunification would require more than one year. To the contrary, the only further treatment needed would end in four months.

Before trial, H.O. completed her chemical dependency training and mental health

34

counseling. She addressed all of the parental deficiencies identified. Her mental health counselor found that her health had improved such that she could care for B.P. H.O. was sober for nine months at the time of trial. She cared for one child younger in age than B.P.

I recognize that returning B.P. to H.O. would create initial trauma to B.P. and witnesses expressed concern about this trauma. Nevertheless, Lori Eastep, the State's primary expert and witness, could not identify any deficiency that H.O. encountered in parenting at the time of trial. Eastep held no safety concerns with H.O. caring for B.P. Eastep agreed that returning B.P. to H.O. could be a very positive thing for B.P. The State wanted Eastep to testify that B.P. could not be returned to H.O. Eastep refused. She instead noted consequences to B.P. of terminating H.O.'s rights. Eastep wanted continued contact between H.O. and B.P. This testimony undercuts the State's position that allowing a relationship to continue between H.O. and B.P., with an ultimate goal of reunification, would cause permanent emotional damage to B.P., rather than temporary emotional pain. Arredondo, *supra*, at 120.

In affirming the trial court's finding that H.O. had not corrected parental deficiencies, the majority commits some factual errors. The majority claims that Lori Eastep testified that B.P. would never be able to form a real attachment to H.O. and forcing B.P. to do so would significantly injure B.P.'s mental health. Majority at 4. Eastep uttered no such testimony. As previously indicated, Eastep advocated a

35

continuing relationship between H.O. and B.P.

The majority claims that services were offered to the mother without the desired effect. The majority does not identify the services provided without success. To the contrary, the services improved H.O.'s mental health and rendered her sober.

When affirming the trial court's decision, the majority ignores the significance of H.O.'s successful parenting of A. The majority only mentions the existence of A. in two sentences near the end of the opinion.

The trial court and the majority worry about H.O. relapsing in substance abuse. Although I share in this disquietude, this worry cannot suffice for termination of parental rights. Otherwise, no alcoholic or drug abuser could ever have his or her children returned. A sober alcoholic or sober drug addict struggles to abstain during the rest of her life. Chemical dependency and a potential relapse were not sufficient in *S.J.* to terminate the parent's rights, and it is not sufficient to terminate H.O.'s rights to B.P.

### B.P.'s Best Interest

The second step in the State's burden in a parental termination case involves proving by a preponderance of evidence that termination is in the child's best interest. RCW 13.34.190(1)(b). As noted in *In re Welfare of A.B.*:

> By virtue of RCW 13.34.180(1) and RCW 13.34.190, a Washington court uses a two-step process when deciding whether to terminate the right of a parent to relate to his or her natural child. The first step focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence. The second step focuses on the child's best interests and need be proved by only a preponderance of the evidence. Only if the

36

first step is satisfied may the court reach the second.

168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (footnotes omitted). No specific factors are involved in a best interest determination, and each case must be decided on its own facts and circumstances. *In re Welfare of M.R.H.*, 145 Wn. App. at 28 (2008).

The emptiest element of parental termination cases is the "best interest" component. The term "best interest" is a vague construct. Its overuse renders the term meaningless. *See* John Thomas Halloran, *Families First: Reframing Parental Rights as Familial Rights in Termination of Parental Rights Proceedings*, 18 U.C. DAVIS J. JUV. L. & POL'Y 51, 76-77 (2004). "[N]umerous critics have objected to the best interest determination claiming that it 'allows the judge to import his personal values . . . and leaves considerable scope for class bias.'" Jennifer Ayres Hand, Note, *Preventing Undue Terminations: a Critical Evaluation of the Length-of-Time-Out-of-Custody Ground for Termination of Parental Rights*, 71 N.Y.U. L. REV. 1251, 1275 (1996).

I recognize that many witnesses, upon whom the trial court relied, testified that termination of B.P.'s relationship with H.O. was in B.P.'s best interest. Therefore, I will not focus on this element of the termination process. I observe, however, some telling testimony of the experts. Lori Eastep saw B.P. and H.O. interact as much as any other witness. The State asked Eastep if termination of the parental-child relationship served B.P.'s best interest. The State did not receive the desired response. Eastep stated H.O.'s retaining parental rights was in B.P.'s best interest. The exchange went:

37

Q. So at this time do you have an opinion about whether termination is in [B.P.'s] best interest?

A. I think permanency is in [B.P.'s] best interest. This may not be the best answer, but I had suggested a guardianship. That's what I thought was in [B.P.'s] best interest was for [H.O.] to retain her parental rights and be involved with her child, but that [B.P.] remain with her current placement because she is attached to them and is doing very well there.

RP at 85.

Amanda Clemons testified she does not believe it is in B.P.'s best interests to have another disruption in care. She did not directly testify that termination of parental rights was in B.P.'s best interests. Clemons never interacted with H.O. and B.P.

Guardian ad Litem Karen Schweigert lacks the qualifications that other witnesses held. She testified termination of H.O.'s parental rights is in B.P.'s best interests. Nevertheless, Schweigert had not seen H.O. and B.P. together since visits resumed in August 2013. Her concerns about H.O.'s decision making arose from information she received from others, not from direct observations.

Marcey Monohan testified termination of H.O.'s parent rights is in B.P.'s best interests. Nevertheless, she acknowledged she did not observe the therapeutic visits between H.O. and B.P. conducted by Lori Eastep. Practitioners consider such observations to be crucial in order to render a qualified, professional opinion as a mental health expert. Arredondo, *supra*, at 121.

The parties and the majority ignore that severing ties between B.P. and H.O. also terminates the companionship of two sisters only one year apart in age. One of the joys

38

of life is the relationship with one's siblings. An only child often regrets the lack of a brother or sister. The sibling relationship generally continues well beyond the death of the parent. "Adults who tend to see the best interest of the child from their own perspective sometimes overlook the importance of sibling relationships in both the short and long term." Arredondo, *supra*, at 122.

*Constitutional Right to Parent*

Even if we assume the State proved all elements of the Washington statutory scheme for termination, including the element of the best interests of B.P., the trial court erred in terminating the parent-child relationship. Although the trial court found that H.O. is an unfit parent, this finding is not supported by the record. This finding contradicts the fact that H.O. successfully parents A. Absent a showing of parental unfitness by clear and convincing evidence, a state may not terminate a parent's right to care of her child regardless of the State's parental termination statutes. The State did not even prove unfitness of H.O. by a preponderance of the evidence.

Both the United States and Washington Constitutions recognize a parent's fundamental liberty interest in care and custody of her children. U.S. CONST. amends. V, XIV; WASH. CONST., art. I, § 3; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Custody of Smith*, 137 Wn.2d 1, 27, 969 P.2d 21 (1998). The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or

39

have lost temporary custody of their child to the State. *Santosky v. Kramer*, 455 U.S. at 753. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Santosky v. Kramer*, 455 U.S. at 753. The child also has an interest in preventing the erroneous termination of its relationship with its natural parents. *Santosky*, 455 U.S. at 765. The concept that all children are wards of the state and that the state and its agencies have an unhampered right to determine what is best for the child belongs to a repudiated political and moral philosophy foreign and repugnant to American institutions. *In re Welfare of Warren*, 40 Wn.2d 342, 343, 243 P.2d 632 (1952).

Courts undertake a grave responsibility when they deprive parents of the care, custody and control of their natural children. *In re Welfare of Sego*, 82 Wn.2d at 738 (1973). Therefore, terminating parental rights is one of the severest of state actions and implicates fundamental interests. *In re Welfare of J.M.*, 130 Wn. App. 912, 921, 125 P.3d 245 (2005).

The six elements of parental termination cases, found in RCW 13.34.180 and .190, address, in part, whether a parent is unfit but the elements are not conclusive or exclusive. Even if the State establishes the termination factors in RCW 13.34.180(1), the trial court may not terminate the rights of a currently fit parent. *In re Welfare of A.B.*, 168 Wn.2d at 919-20 (2010); *In re Welfare of A.G.*, 160 Wn. App. 841, 845, 248 P.3d 611 (2011); *In re Welfare of Shantay C.J.*, 121 Wn. App. 926, 936, 91 P.3d 909 (2004); *Santosky*, 455 U.S.

40

at 760. Termination of the parent-child relationship must be based on *current* parental unfitness. *In re Dependency of T.L.G.*, 126 Wn. App. at 203 (2005). Identifying parenting deficiencies is not the equivalent of proving parental unfitness. *In re Dependency of Schermer*, 161 Wn.2d 927, 943, 169 P.3d 452 (2007).

A finding of current unfitness requires more than the determination that DSHS proved by a preponderance of the evidence that a parenting deficiency exists. The due process clause demands the State establish unfitness by clear, cogent and convincing evidence. *In re Welfare of A.B.*, 168 Wn.2d at 920; *In re A.W.*, 53 Wn. App. at 29 (1988). When the evidence is insufficient to support a finding that the mother of a child is currently deficient, the trial court cannot make such a finding, and, without such a finding, the trial court cannot terminate the mother's relationship with her child. *In re Welfare of A.B.*, 168 Wn.2d at 920; *In re Welfare of C.B.*, 134 Wn. App. 942, 959, 143 P.3d 846 (2006). When the evidence is insufficient to support a finding that the father is currently deficient at the time of trial, termination is improper even if the evidence shows that the father is deficient at an earlier time. *In re Welfare of A.B.*, 168 Wn.2d at 920; *In re Welfare of Churape*, 43 Wn. App. 634, 638, 719 P.2d 127 (1986).

RCW 13.34.020 reads that the child's rights and needs prevail, but the State ignores other portions of the statute. The first two sentences of RCW 13.34.020 read:

> The legislature declares that the family unit is a fundamental
> resource of American life which should be nurtured. Toward the
> continuance of this principle, the legislature declares that the family unit

should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized.

The trial court erred by finding H.O. was currently unfit to parent B.P. Lori Eastep testified she does not have any safety concerns when H.O. and B.P. are together. Eastep could not identify any problem in H.O.'s parenting. The fact that H.O. cared for A. established the contrary. All witnesses who observed A. were impressed with A.'s development, if not H.O.'s mothering of A. Eastep described A. as "a very healthy, happy little girl." RP at 73. Marcey Monohan testified that as long as H.O. remains clean and sober, she has no concern regarding H.O.'s ability to meet A.'s needs. Since B.P. can receive basic nurture, health and safety from H.O., RCW 13.34.020 demands the return of B.P. to H.O.

The State's primary concern is B.P.'s lack of attachment to H.O. The fact children have been in foster homes and have developed ties to their foster parents cannot be the controlling consideration. *In re Welfare of Churape*, 43 Wn. App. at 639 (1986). *In re S.J.*, 162 Wn. App. 873 (2011) established that a lack of attachment to the child does not render a parent unfit. In *S.J.*, we also held that the termination order violated T.H.'s constitutional rights to parent her child. The record lacked a showing that T.H. was unfit to parent.

*In re Welfare of A.B.*, 168 Wn.2d 908, 919, 232 P.3d 1104 (2010) is also parallel. The trial court found little likelihood that conditions will be remedied so that the child could be returned to or placed with her father in the near future. Despite the father's

42

efforts to render visitations meaningful, he failed to establish a "close attachment" with his daughter. The trial court found this lack of bonding profound and intractable and attributed it to subtle changes in the child's relationship with her caretaker. The state Supreme Court reversed the termination because of the lack of a finding that the father was currently an unfit parent.

Foreign jurisdictions have rejected the argument that a child should not be returned to a natural parent because the child has emotionally attached to foster parents. Although these jurisdictions rendered decisions in other contexts, the courts' persuasive reasoning establishes that termination of H.O.'s parental rights constitutes a violation of the due process clause. The courts' analysis of expert testimony on childhood bonding is also instructive.

In *In re B.B.M.*, 291 S.W.3d 463 (Tex. App. Dallas. 2009), Shawn M. challenged the trial court's order appointing two nonparents as managing conservators or guardians of his son. The father argued that the evidence did not support the jury's finding that appointing him as managing conservator would significantly impair the child's physical health or emotional development. The appeals court agreed and remanded for a new trial.

B.B.M. was the biological child of Shawn M. Shawn M. separated from the mother before B.B.M.'s birth. Without Shawn M.'s approval, the mother permitted adoption of B.B.M. by Travis and Sabra Hess. An adoption coordinator told the Hesses that the father of B.B.M. consented to the adoption, and the Hesses took B.B.M. from his

43

birthplace in Dallas to Idaho. The adopting agency later brought action to terminate the parental rights of Shawn M. Shawn M. counter-petitioned to establish his paternity, and the Hesses intervened to request termination of Shawn M.'s parental rights or, in the alternative, to grant them conservatorship over B.B.M. The trial court entered an order confirming the jury's verdict that refused to terminate Shawn M.'s parental rights, but granted the Hesses conservatorship over B.B.M.

The Texas law on childhood conservatorship echoes Washington law on termination of parental rights. To gain the conservatorship over the child, the nonparent must prove by a preponderance of the evidence that appointment of the parent as managing conservator significantly impairs the child's physical health or emotional development. Evidence that a nonparent would be a better custodian of the child was inadequate to meet this burden. The Hesses relied on evidence of the impairment of B.B.M.'s emotional development resulting from his removal from their home. The appellate court responded that the proper focus was on whether the placement of the child with the natural parent would significantly impair the child's physical health or emotional development. The court answered that the negative effect on the child caused by his separation from nonparents is not sufficient to deny a natural parent managing conservatorship, because of the parent's fundamental liberty interest in the care, custody, and management of his child.

In *B.B.M.*, the Hesses presented the expert testimony of Dr. Beth Bontempo, a

44

psychologist, who conducted a "bonding and attachment assessment." Bontempo stated that she could "hypothesize based on attachment theory" that the child at issue would experience a breach of trust, broken attachment, and a sense of abandonment if taken from the Hesses. *In re B.B.M.*, 291 S.W.3d at 468. Bontempo conceded, however, the difficulty in predicting the future of a child. The Texas appellate court relied on the rule that a mere potential threat, as opposed to evidence of actual harm to the child's emotional development, was insufficient to deny a natural father the right to raise his own son. Although Shawn M. did not have the difficult history that H.O. has, *B.B.M.* illustrates that the State may not terminate parental rights based on a lack of attachment between the child and the parent. The Texas court noted that the rights of a natural parent are essential and far more precious than any property right.

*In re Guardianship of Ashleigh R.*, 2002-NMCA-103, 132 N.M. 772, 55 P.3d 984 has an outcome similar to *In re B.B.M.* A mother appealed from a judgment appointing the grandmother as guardians for her two daughters. The mother argued that the trial court lacked authority under the New Mexico Probate Code to appoint guardians for the children when she retained the right to custody. She also argued that the trial court should have granted her custody of her daughters in the absence of an express finding that she was an unfit parent. The appeals court agreed and held that the trial court could not deny the mother custody without an express finding that she was unfit.

In *Ashleigh R.*, the two children assumed residency with their maternal

grandmother when the mother and father experienced marital difficulties. When the marriage ended in divorce, the mother joined the grandmother and the two girls. For the next two years, the mother moved in and out of the house, sometimes taking the girls with her but usually leaving them in the care of the grandmother. When the mother demanded return of the daughters, the grandmother filed a guardianship action.

The New Mexico court in *Ashleigh R.* applied the rule that the trial court must ordinarily make an express finding that the parent is unfit before denying the parent custody. The court recognized the difficulties involved for children who are removed from stable, loving homes and separated from people who have acted as psychological parents. After a prolonged separation, the biological parent, though not unfit, may be incapable of reestablishing the necessary parental bond with the child. Nevertheless, the parent still may regain custody unless the court finds parental unfitness or extraordinary circumstances. The court is not free to weigh the best interests of the child. The parent does not forego the right to custody of a child by the child entering the custody of another when the parent needs assistance. Unstable or inadequate parents can turn their lives around and become suitable custodians for their children. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.

In *Ashleigh R.*, the grandparents testified that the girls did not want to live with

their mother and experienced nightmares and other signs of emotional stress when they visited her. The appeals court answered that the psychological harm from the transfer of custody cannot be presumed, but must be proven by those who seek to deny custody to the parent. Relying on a text on attachment and bonding, the court observed that commentators warn against overemphasizing potential psychological harm. The court noted that any transition is likely to cause some stress but not necessarily long-term psychological damage.

In *In re Guardianship of J.C.*, 129 N.J. 1, 608 A.2d 1312 (1992), the court reversed a trial court's ruling terminating parental rights of a mother to three children, despite the children bonding with foster parents. The mother had a long history of homelessness, domestic abuse, and substance abuse. The children remained in foster care for five years. The trial court ruled that the mother's parental rights should be terminated, while emphasizing the psychological harm that would result from breaking the bonds that each child had formed with foster caretakers. The trial court blamed the mother for her inability to plan for their future and her failure to rehabilitate herself. One child was emotionally disturbed as a result of the conduct of her mother. As in this appeal, the State presented a parade of expert witnesses at trial who testified to the bonding of the children with foster parents and the harm caused by reunification with the mother. The witnesses echoed the opinion that severing of parental ties would be in the best interest of the children. The mother presented testimony from her chemical

47

dependency counselor that she completed treatment and was sober. Nevertheless, the trial court expressed concern, in his findings, that the mother would relapse.

When reversing the trial court in *In re Guardianship of J.C.*, the Garden State court noted that the law reflects a strong societal bent in favor of the integrity of the natural family. Parents have a constitutional, fundamental liberty interest in raising their biological children, even if those children have been placed in foster care. Termination of parental rights permanently cuts off the relationship between children and their biological parents. Few forms of state action are both so severe and so irreversible. To show that the child has a strong relationship with the foster parents or might be better off if left in their custody is not enough. The State must prove by clear and convincing evidence that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm.

The New Jersey court, in *In re Guardianship of J.C.*, reviewed psychological literature on childhood attachment. The court noted competing psychological theories of the effects of parental bonding. Some psychologists hold that change under the right circumstances can play a positive role in children's development. Although natural parents can be a disruptive influence for children who have been adopted, some commentators and psychologists believe that eliminating the natural parents from the children's lives and memory is impossible and therefore wrong. Scholars suggest that courts rely too often on theories of parental bonding to keep children in foster care rather

48

than return them to their parents. In addition, the uncritical use of bonding theory can tilt the process in favor of the State and its social workers and foster parents and be misused to determine only which set of parents is optimum or "better" in some vague social sense, rather than capable of rearing the child without serious harm. The court questioned whether social workers are qualified to express opinions concerning psychological bonding and the harmful consequences to the children from its disruption. The New Jersey court discounted, if not rejected, testimony from experts who had not conducted a formal bonding study. In the final analysis, the court concluded that there was not clear and convincing evidence to support the determination to terminate the mother's parental rights. The court remanded for further testimony and analysis.

In this appeal, no psychologist testified to an attachment disorder suffered by B.P. No psychologist testified to permanent and serious harm to B.P. if she returns to her mother. All agreed that H.O. is parenting a happy, well-adjusted A.

By my dissent, I do not suggest that DSHS must relinquish B.P. to H.O. for the rest of B.P.'s minority. I only advocate the vacation of the termination order. Although B.P. should return to her mother, the dependency should remain for a reasonable period of time to ensure that H.O. remains sober and capable of caring for B.P.

Fearing, J.

49